IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 26, 2019

## STATE OF TENNESSEE v. ANTHONY MARTIN, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 109463     G. Scott Green, Judge**

### No. E2018-01066-CCA-R3-CD

The Defendant, Anthony Martin, alias, appeals his jury conviction for rape of a child.  In this direct appeal, the Defendant alleges that the trial court erred when it allowed the State to question him about facts underlying a statutory rape by an authority figure conviction as a prior inconsistent statement.  Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

J. Liddell Kirk (at motion for new trial and on appeal), Knoxville, Tennessee; and Rhonda F. Lee (at trial), Powell, Tennessee, for the appellant, Anthony Martin, alias.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel D. Russell and Nathaniel R. Ogle, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

On November 30, 2016, a Knox County grand jury charged the Defendant via presentment with one count of rape of a child.  See Tenn. Code Ann. § 39-13-522.  The Defendant was alleged to have engaged in anal intercourse between July 30, 2013, and

July 29, 2014, with the victim, S.C.,[1] who was less than thirteen years of age at the time. The Defendant proceeded to a jury trial in November 2017.

Prior to trial, the State had filed a notice pursuant to Tennessee Rule Evidence 609 seeking to cross-examine the Defendant, if he chose to testify, with his prior 2014 conviction for statutory rape by an authority figure, 2013 conviction for aggravated assault, and 2013 conviction for misdemeanor theft. On the morning of trial, the Defendant asked that the State not be allowed to impeach him with the statutory rape by an authority figure and aggravated assault convictions, arguing that their admission was "prejudicial." The State submitted that both offenses were within the ten-year time limit and argued that the statutory rape by an authority figure conviction was not "so prejudicial that it outweigh[ed] the probative value" because it was "not a rape or a rape of a child." The trial court observed, "Would the probative nature of that conviction, though, as to his credibility, outweigh the prejudicial effect? . . . [H]e's on trial for rape of a child . . . . I mean, I understand it's a felony conviction, but does the [c]ourt not have to go through that weighing process." The trial court then reserved ruling on the issue.

At trial, the sixteen-year-old victim testified that he went to Whittle Springs Middle School during the sixth and seventh grades and that he met the Defendant's son there. The victim stated that, when he was twelve years old, he would go to the Defendant's house approximately two times per week and that he spent the night there more than ten times. The victim identified a photograph of the Defendant's Chipman Street home. In addition, the victim confirmed that the Defendant sent him text messages and called him on his cell phone during this time frame. The victim explained that his relationship with the Defendant "was good at the beginning and then it just went downhill from there."

The Defendant had two other sons and one daughter; however, the victim was sometimes alone with the Defendant. According to the victim, when he spent the night at the Defendant's home, the Defendant "always" made him sleep in the bed with the Defendant and one of the Defendant's older sons, which made the victim "uncomfortable." The victim testified that the last time he spent the night at the Defendant's house was the night of "the incident."

The victim recalled that, on that particular day, there was "snow on the ground." After the Defendant picked up the victim, the victim and the Defendant smoked marijuana in the car on the way to the Defendant's home. After arriving at the Defendant's home, the victim and the Defendant's sons played video games in the Defendant's bedroom while the Defendant was "[i]n the kitchen making chicken."

---

[1] It is the policy of this court to refer to minor victims of sexual crimes by their initials to protect their identity.

According to the victim, they smoked more marijuana while playing video games, and the Defendant supplied them with vodka to drink. The victim also claimed that the Defendant gave him some blue pills to take, telling him that the pills would "make [him] feel better."

The victim testified that all three of the Defendant's sons spent the night that evening and that everyone eventually went to sleep. According to the victim, the Defendant and one of his sons fell asleep in the Defendant's bedroom; the Defendant's other two sons fell asleep in the kitchen; and the victim fell asleep on the couch lying on his stomach. At some point, the victim was awakened by the Defendant on top of him pulling his pants down, and the victim could not move. The Defendant also removed his own clothing. According to the victim, he then felt something cold, wet, and slimy, which he thought was "lube[,]" followed by a "very sharp pain." The victim described that the Defendant penetrated the victim's anus with his penis and that he moved in an "up-and-down movement" while doing so. The Defendant continued in that movement for about five minutes until he ejaculated. The victim said that he "felt paralyzed" and wondered, "When is it going to be over?" Neither the Defendant nor the victim said anything during the encounter.

The victim testified that he could not see the Defendant because he was lying on his stomach. However, the victim was able to identify the Defendant by his hair because the Defendant was the only person in the house who had "long braids." The victim also saw the Defendant "get up" and "leave" after the incident. The victim observed the Defendant "walking back to his room," and he could "see the logo on [the Defendant's] pants." The victim testified that he fell back asleep with his pants still down around his ankles. When the victim woke up the following morning, his "stomach and [his] ass [were] hurting." After pulling up his pants, the victim went to the bathroom, and when he used the bathroom, he saw "like a reddish-clearish discharged coming out" of his anus. According to the victim, the Defendant took him home that morning, but they did not talk during the drive. The victim did not tell his parents about the incident because he "felt ashamed." The victim said that he never returned to the Defendant's home after that night. However, the Defendant continued to text him "a lot" asking him to come over, but the victim did not respond. According to the victim, his mother eventually confronted the Defendant about the text messages.

Additionally, the victim claimed that he started having "real bad anger problems" after the encounter. The victim explained that he began having trouble with "[m]ale authority" figures and started using drugs and alcohol. The victim confirmed that he was "kicked out" of school and that he had to go to an "alternative school." The victim was also adjudicated delinquent in juvenile court for burglary, theft, and vandalism. The

victim was ultimately sent to an alcohol and drug treatment program, and he was still on probation at the time of the Defendant's trial.

While at the treatment program, the victim met a female who confided in him that she had been raped but did not know how to tell her parents. The victim promised her that, if she told her parents about her rape, he would likewise tell his parents about what had happened to him. That night, he told his parents. His parents contacted the police, and the victim was interviewed on March 30, 2016. The victim acknowledged that he did not tell the interviewer about any discharge coming from his anus. The victim's forensic interview was played in its entirety for the jury. However, the recording's admissibility was limited to assessing the victim's credibility "as corroborative or inconsistent proof."

After the jury was dismissed for the day, there was further discussion about use of the Defendant's prior criminal record if he chose to testify. The trial court ruled that the State would be permitted to cross-examine the Defendant about his aggravated assault conviction. The trial court noted its reservation on admitting the Defendant's statutory rape by an authority figure conviction, stating that, when court resumed the following morning, it wanted details and specifics about that conviction and additional caselaw presented regarding its admission. The State then agreed not to ask the Defendant about the statutory rape by an authority figure conviction unless the Defendant "opened the door" to its admission during his testimony.

When court resumed the following the morning, the victim's mother, S.B.,[2] testified and confirmed much of the victim's account. S.B. stated that she knew the Defendant because the victim was friends with one of his sons when the victim was twelve years old and in the seventh grade. For a period of a "[c]ouple of months," the victim would sometimes spend the night at the Defendant's home, and the Defendant would normally pick him up for those visits. However, the victim eventually stopped going to the Defendant's house, but S.B. did not know why. According to S.B., the victim's behavior, attitude, and sleep habits changed about that same time.

S.B. explained that the victim developed anger issues and started fighting in school. S.B. confirmed that the victim was arrested when he was in seventh grade and that he was eventually kicked out of school towards the end of his seventh-grade year and placed in an alternative school. S.B. asserted that, prior to this time period, the victim had never expressed any anger issues and had never gotten into serious trouble. According to S.B., the victim expressed a lot of anger toward males, but especially "males with dreads." S.B. recalled a particular time when they were inside a convenience store "and a male with dreads came in and [the victim] got real close to [her] and crunched up[,] and [she] had to remind him that . . . it was okay." In addition, S.B.

---

[2] To further protect the victim's identity, we will refer to his mother by her initials.

described that the victim would wake up "in the middle of the night, just kind of roaming the house, just sitting there." She thought the victim only got about three or four hours of sleep a night. Moreover, the victim insisted that his bedroom door be locked whenever he was trying to sleep. S.B. maintained that the victim also started having issues with drugs and alcohol and that the victim was ultimately given "sleeping medication" and "a mood stabilizer." According to S.B., "outpatient rehab" was unsuccessful, so they had to place the victim in an "inpatient rehab."

S.B. recalled that, at some point, she spoke with the Defendant about various text messages he had sent the victim, although S.B. could not recall exactly what she said to the Defendant. She remembered that she was "[v]ery angry" and "confused" during this conversation "because of the substance of those text messages[.]" However, S.B. did not call the police at that time because, while the text messages were "inappropriate," they did not indicate "that anything sexual had happened between" the victim and the Defendant. S.B. explained that the victim was in an inpatient drug rehabilitation program in 2016 and that was when he told her specifically for the first time that the Defendant had raped him. S.B. immediately reported the rape allegation to the Family Justice Center, and the victim was interviewed at Child Help by a child forensic interviewer. S.B. believed that the conversation she had with the Defendant about the text messages occurred approximately a year and a half to two years prior to the victim's 2016 revelation.

Jonathan Harris testified that he was assigned to the Knoxville Police Department's Special Crimes Unit and that he investigated the rape allegation against the Defendant. Officer Harris maintained that he was unable to locate any of the Defendant's sons. Moreover, Officer Harris was shown the photograph of the Defendant's home that was identified by the victim, and Officer Harris confirmed that the house was located on Chipman Street in Knoxville.

During a jury-out discussion, the Defendant expressed his desire to testify on his behalf. The State noted that it would only ask the Defendant about his theft and aggravated assault convictions and that it would not ask him about his statutory rape by an authority figure conviction unless he opened the door somehow. The trial court agreed with the State's strategy, noting,

> Obviously, if he opens up the door, you know, if he makes some assertion like, I would never, ever have sex with someone under age, he's opened the door up to that question. But absent that, the State has agreed that his aggravated assault conviction is fair game. I mean, you've already told the jury he's a convicted felon[.]

Trial resumed, and the forty-one-year-old Defendant testified that he was married with three children, although he lived separately from his wife. The Defendant confirmed that the victim and his son were friends through school and that the victim had spent the night at his home "over ten times" during a four- to five-month period. The Defendant claimed that he first met the victim after his son told him that the victim had been "fighting the police at school" and how he had been "acting out." According to the Defendant, the victim told him that he had anger issues, and the Defendant instructed the victim not to "do bad things" or "disrespect authority figures." The Defendant claimed that he was trying "to steer [the victim] in the right direction."

The Defendant denied ever giving the victim marijuana, alcohol, or pills, and he denied having any sexual contact with the victim. The Defendant testified that no one was ever allowed to sleep on his couch. According to the Defendant, his sons slept on the bottom bunk of the bunk beds in their room when the victim spent the night, and the victim slept on the top bunk. The Defendant asserted that the victim never slept with him in his bed, although on one occasion the victim fell asleep in the Defendant's bedroom after playing video games. However, he maintained that he woke the victim and told him to go into his sons' room. In addition, the Defendant claimed that he never spent time with the victim alone because one of his children was always present.

The Defendant said that he moved from the Chipman Street house to a residence in Lonsdale, and the victim continued to visit him in Lonsdale. However, the Defendant eventually lost the home in Lonsdale. According to the Defendant, he did not text the victim and ask him to visit after he stopped coming over. The Defendant claimed instead that the victim stopped coming over at that time because there was "nowhere for him to come over anymore." The Defendant admitted that he exchanged text messages with the victim and that he may have told the victim that he loved him. The Defendant explained that he often told his sons' friends that he loved them and that it was meant as "[l]ike a son." In addition, the Defendant maintained that he had never spoken with the victim's mother on the telephone, although they had texted back and forth about some comments the Defendant had made to the victim.

The Defendant acknowledged that he had a misdemeanor theft conviction and was "a convicted felon" on direct examination. On cross-examination, the Defendant admitted that he sometimes smoked marijuana and drank alcohol and that he had a conviction for aggravated assault.

On redirect examination, the Defendant confirmed that his sons' friends sat on his bed to play video games because the television was in his bedroom. Specifically, the Defendant testified as follows:

Q. [W]hen you were talking about the kids were in your bed on the video games, was that a common thing?
A. Yeah.
Q. They were in your room playing video games?
A. Playing video games. There wasn't nowhere [sic] else to sit, so they would sit on my bed.
Q. Okay. And so the video wasn't in the living room?
A. Huh-uh.
Q. It was in your room?
A. It was in my room.
Q. Okay. So if they went in there and fell asleep, that wasn't uncommon?
A. No. I had it in my room because I had a time limit on it, to where I would tell them, that's it, no more playing games.
Q. Okay.
A. But sometimes I would let them play excessively.
Q. So did [the victim] ever fall asleep in there playing a video game?
A. I mean, not only [the victim]. A couple of his friends done [sic] fell asleep and I had to tell them to get up.
Q. Okay. Did you ever get in the bed with them?
A. No. I had a friend that his momma came over and she was asleep in my bed and she was, like, boy, get up, because he done fell asleep.
Q. Okay. Did you ever get in the bed with [the victim]?
A. No, I never got in bed with [him].

The Defendant was then asked, "And you never had any sexual contact with [the victim]?" The Defendant replied, "No. Never sexual contact with none of them, huh-uh."

The State requested a bench conference. During the jury-out hearing that followed, the State argued that the Defendant had opened the door "to the fact pattern" from his prior conviction for statutory rape by an authority figure when he testified that he had never gotten in bed with any of the children who had fallen asleep in his bed but, instead, made them move. The State provided the following facts surrounding the Defendant's guilty plea to statutory rape by an authority figure of the sixteen-year-old victim, K.G.[3]:

> The information that the victim gave in his forensic interview, which was read . . . in the stipulation of facts when the [D]efendant pled guilty, was that the victim . . . said that the [D]efendant came and picked him up, that [the Defendant's older son] wasn't in the car, but he went anyway, that

---

[3] To protect the minor sex abuse victim's anonymity, we will refer to him by his initials.

when he got to the house, he went inside and sat down and was quiet. That's when [the Defendant] asked him if he wanted something to drink. And [K.G.] said, sure. [K.G.] described the alcohol as being clear. They did not drink before. They were drinking. They smoked marijuana together. It made him sick. He went and threw up. [K.G.] said he went and laid down in [the Defendant's] bedroom to try and sleep, when [the Defendant] grabbed his hand and told [K.G.] to jerk off. [K.G.] said he was sleeping and woke up with [the Defendant's] putting his hand on [the Defendant's] penis when this occurred. [K.G.] said [the Defendant] gave him a blow job and a hand job while he was sleeping.

[K.G.] stated on two different occasions, [the Defendant] put his penis in his butt hole. [K.G.] stated this hurt. [K.G.] stated that [the Defendant] put his head to [the Defendant's] . . . penis and that [the Defendant] also gave him a blow job.

All sexual activity occurred in the Defendant's bed at the Lonsdale home. The date of the offense was March 2014, and the Defendant pled guilty in 2014.

According to the State, "the [D]efendant ha[d] opened the door to talk about whether or not there [was] another child who slept in the [D]efendant's bed and the fact that that also then progressed to sexual activity." The trial court ruled that State could ask the Defendant whether

there was another one of [the Defendant's sons'] friends that slept in [the Defendant's] bed; the fact that [the Defendant] did not ask him to get out of that bed; the fact that [the Defendant] stayed with him the entire night; [and] the fact that that was in March of 2014, at the Lonsdale house.

The State could not probe "into the sexual allegation" unless the Defendant denied that he had slept with another child in his bed.

On recross examination, the Defendant admitted that, in March 2014, K.G. had spent the night at his Lonsdale house and fallen asleep in the Defendant's bed. However, the Defendant claimed that he did not sleep in the bed with K.G. and that K.G. did not stay in the bed all night. The Defendant testified that he was not in bed with K.G. when K.G. woke up. The State asked for a bench conference. The State remarked that the Defendant had just denied being in bed with K.G. but that the stipulated facts at the Defendant's previous guilty plea were that K.G. woke up to find the Defendant in bed with him and touching his penis. The trial court dismissed the jury to hear additional arguments.

The State asked that it be allowed to impeach the Defendant "with the prior facts of the other crime" as a prior inconsistent statement impacting the Defendant's credibility. The court ruled that it would allow the State to ask the Defendant again about whether he was in bed with K.G. when K.G. woke up. If the Defendant answered affirmatively, then the inquiry into the other case would cease. However, if the Defendant denied it, then the trial court would consider allowing the State to introduce further proof on the Defendant's inconsistent statement. At that time, the State noted that the Defendant had also spoken with investigators regarding the allegations by K.G. and that he told them that he had slept in the bed with K.G. and that K.G. had started to touch him. The State submitted that referring to the Defendant's police statement was possibly "cleaner" than having to get into the stipulation of facts from the guilty plea, which included a reference to drugs and alcohol. Defense counsel argued that use of the Defendant's prior statement was "very prejudicial" and averred that the question asked of the Defendant "was directed towards that night." The trial court commented that it was trying to keep references to the prior offense "as sterile as possible," but it also reasoned that the Defendant would not be permitted "to take the stand under oath and deny that which [he] ha[d] previously said occurred on another occasion, be it in a police interview or under oath in a plea colloquy." The trial court reiterated that it would allow the Defendant "one more opportunity to listen to [the] question and offer his response." The trial court repeated that the Defendant had opened the door to questions about his conduct with other young men.

The jury returned, and the State resumed its recross examination. The following colloquy occurred:

Q. When [K.G.] woke up in your bed, were you in that bed with him?
A. Yes. I didn't understand the question at first.
THE COURT: You were what? I'm sorry.
THE [DEFENDANT]: I said, I didn't understand the question the way she asked it at first.
Q. So [K.G.], who was friends with your son, . . . slept in your bed and you were in the bed with him?
A. We fell asleep, yeah.
Q. You both fell asleep in your bed?
A. Yeah. I was tired. I passed out.

The State asked for a bench conference to clarify if the Defendant's statement that he "passed out" in the bed "opened any further doors[,]" noting that it had "only asked [the Defendant] if he was in bed with the kid when he woke up and [the Defendant] elicited that on his own." The trial court allowed the State to ask the Defendant "if he was awake when K.G. woke up[,]" reasoning that the Defendant's testimony gave the impression

-9-

that he "fell asleep and was passed out when [K.G.] woke up." The State then inquired, "So may I ask [the Defendant] if the two of them were ever awake at the same time in his bed?" to which the trial court responded affirmatively.

Back in front of the jury, the State asked the Defendant if he and K.G. were "ever awake in that bed at the same time together." The Defendant responded that his own snoring woke him up and that he found K.G. awake in his bed. The State again asked for a bench conference and noted that the Defendant testified inconsistently with his prior statement to police describing "how he woke up." The trial court permitted the State to "lay the foundation" for the Defendant's prior statement and refresh the Defendant's recollection with "specifics about . . . how they each awoke," but the court also cautioned the State to "stay away from the prior sexual" acts. The trial court remarked that the Defendant kept "opening the door wider and wider."

Questioning resumed, and the Defendant admitted that he gave a statement to an investigator from the Knoxville Police Department in March 2014. The Defendant stated that he could not remember if he told the investigator that his snoring woke him the night he fell asleep in the bed with K.G. The State gave the Defendant a copy of his statement to refresh his memory. The Defendant confirmed that his recollection had been refreshed and then admitted that he did not tell the investigator that he woke up that night due to his own snoring. The State then ended its recross examination.

Following the conclusion of the proof, the jury found the Defendant guilty as charged. Thereafter, the trial court sentenced the Defendant as a Range II, multiple offender to forty years' incarceration. The Defendant's timely motion for new trial was denied, and his appeal is now properly before this court.

## ANALYSIS

On appeal, the Defendant argues that the trial court committed reversible error in allowing, over defense objection, the State to "badger" the Defendant about the underlying facts of the 2014 statutory rape by an authority figure conviction, "which involved an unrelated victim and which occurred at a later time from the facts in the present case and at a different location." The Defendant contends that any probative value in assessing his credibility was substantially outweighed by the danger of unfair prejudice in revealing that he had been the subject of a prior police "investigation involving the sexual abuse of another teenage male." The State responds that the trial court properly exercised its discretion when it allowed the State to ask the Defendant about his prior inconsistent statement.

Evidence that is not admissible may be admitted if the defendant "opens the door" by putting the issue into controversy. State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012)

(concluding that, "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence"). A party commonly opens the door "by raising the subject of that evidence at trial." Id. Our supreme court has explained, "[w]hen a party raises a subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." Id. (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039.1 (2d ed. 1987)).

Although raising a subject at trial is one manner of opening the door to otherwise inadmissible evidence, the concept of "opening the door" is "notoriously imprecise." Gomez, 367 S.W.3d at 246 (quoting 21 Charles Alan Wright et al., Federal Practice & Procedure Evidence § 5039)). In addition,

> [a]lthough the doctrine arises from the common law tradition of evidence, cf. Roger C. Park et al., Evidence Law § 1.11 (3d ed. 2011) (describing "curative admissibility" as a common law doctrine), our Rules of Evidence contain numerous examples by which otherwise inadmissible evidence may become admissible as a result of the action of a party in the case.

Id. For example, if evidence of prior bad acts of a defendant is inadmissible, the defendant may open the door to admission of that evidence by putting his character at issue. Id. (citing Tenn. R. Evid. 404(a)(1), (2); see also Tenn. R. Evid. 405(a)). A party may also "open the door" to evidence of a witness's truthful character by attacking the reputation of a witness for truthfulness. Id. (citing Tenn. R. Evid. 608(a)). In short, "opening the door" is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence. Id.

The admissibility of impeachment evidence is a matter within the trial court's sound discretion, and we review such decisions under an abuse of discretion standard. See Gomez, 367 S.W.3d at 243; State v. Hayes, 337 S.W.3d 235, 261 (Tenn. Crim. App. 2010). Therefore, "[a] decision to admit evidence will be reversed 'only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning' and the admission of the evidence 'caused an injustice to the party complaining.'" Gomez, 367 S.W.3d at 243 (quoting State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000)).

The Defendant maintains that he did not open the door to any actions taking place at the Lonsdale house in 2014. According to the Defendant, he was confused by the State's line of questioning, believing that the questions were limited to his actions at the Chipman Street house in 2013.

Initially, the Defendant testified that several other children in addition to the victim had fallen asleep in his bed, but he maintained that he had always made them "get

-11-

up." He said that he had never gotten "in the bed with them" or the victim. He then gave an example where a child's mother and her son had fallen asleep in his bed, but they both got up when they woke up. Finally, the Defendant claimed that he had never had "sexual contact" with any of the children. Regarding this line of questioning, the trial court remarked, "Has the attempt not been made here, clearly, to portray to this jury that, look, these kids fall asleep in my bed from time to time, and I just make them get up as soon as I'm ready to come pile in?" The trial court reiterated that the Defendant had opened the door to questions about his conduct with other young men. Ultimately, the trial court ruled that the State could ask the Defendant whether

> there was another one of [the Defendant's sons'] friends that slept in [the Defendant's] bed; the fact that [the Defendant] did not ask him to get out of that bed; the fact that [the Defendant] stayed with him the entire night; [and] the fact that that was in March of 2014, at the Lonsdale house.

Back in front of the jury, the Defendant testified that, in March 2014, K.G. had spent the night at the Defendant's Lonsdale home and had fallen asleep in the Defendant's bed. However, the Defendant claimed that he did not sleep in the bed with K.G. and that K.G. did not stay in the bed all night. The Defendant testified that he was not in bed with K.G. when K.G. woke up.

In the jury-out hearing that followed, the trial court determined that it would allow the State to ask the Defendant again about whether he was in bed in K.G. when K.G. woke up. If the Defendant answered affirmatively, then the inquiry into the other case would stop. However, if the Defendant denied it, then the trial court would consider allowing the State to introduce further proof on the Defendant's inconsistent statement. When the Defendant was subsequently asked if he and K.G. were "ever awake in that bed at the same time together," the Defendant said that his own snoring woke him up and that he found K.G. awake in his bed. Because the Defendant had testified inconsistently with his prior statement to police describing "how he woke up," the trial court permitted the State to "lay the foundation" for the Defendant's prior statement and refresh the Defendant's recollection with "specifics about . . . how they each awoke[.]" The trial court remarked that the Defendant kept "opening the door wider and wider." Questioning resumed, and the Defendant admitted that he did not tell the investigator that he woke up that night due to his own snoring.

From our review of the Defendant's testimony, we cannot say that the trial court abused its discretion by concluding that the Defendant had opened the door to this limited line of questioning. The trial court commented that it was trying to keep references to the prior offense "as sterile as possible," but it also reasoned that the Defendant would not be permitted "to take the stand under oath and deny that which [he] ha[d] previously said occurred on another occasion, be it in a police interview or under oath in a plea

-12-

colloquy." As the trial court noted at the motion for new trial hearing, "the whole issue in this case was credibility." The jury was aware that the Defendant was "a convicted felon" and had prior convictions for aggravated assault and misdemeanor theft. Ultimately, the State did not introduce evidence that the Defendant had previously been convicted of statutory rape by an authority figure or any facts indicating that the Defendant had engaged in sexual activity with K.G. Instead, the jury only heard that K.G. was friends with the Defendant's son; that he occasionally visited the Defendant's home; that he once slept in the Defendant's bed; that the Defendant "passed out" in the bed next to him; that the Defendant claimed he was awakened by his own snoring and that K.G. was awake at that time; and that the Defendant had not previously told an investigator during a police interview that his own snoring woke him up. The State's questioning was certainly within the "realm of relevance" of the issues that the Defendant raised on redirect examination. Gomez, 367 S.W.3d at 246. These facts surrounding the 2014 offense were not unfairly prejudicial. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE